**In re BANKRUPTCY ESTATE OF MARKAIR, INC., Debtor.**

**William Barstow, III, Appellant,**

**v.**

**United States Internal Revenue Service, Appellee.**

No. 01–35819.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 6, 2002.

Filed Oct. 21, 2002.

John C. Siemers, Burr, Pease & Kurtz, Anchorage, AK, for the appellant.

Theresa J. Clark, Tax Division, United States Department of Justice, Washington, DC, for the appellee.

Before: B. FLETCHER, ALARCÓN, and GRABER, Circuit Judges.

GRABER, Circuit Judge.

William Barstow, Trustee of the bankruptcy estate of MarkAir, Inc. (MarkAir), seeks to subordinate the proceeds of a judicial lien securing taxes owed to the United States Internal Revenue Service (IRS). The Trustee relies on § 724(b) of the Bankruptcy Code, 11 U.S.C. § 724(b), which subordinates tax liens to the claims of certain priority unsecured creditors. The bankruptcy court denied the Trustee's request to subordinate, and the district court affirmed. The Trustee appeals and we, too, affirm. We hold that the term "tax lien" in § 724(b) means a statutory tax lien and that the term does not embrace a judicial lien securing an underlying tax obligation.

## FACTUAL AND PROCEDURAL HISTORY

In June of 1992, MarkAir filed for bankruptcy under Chapter 11. When the company filed its petition, it had an outstanding liability for air transportation excise taxes. However, the IRS had not yet filed a Notice of Federal Tax Lien with respect to this liability and, accordingly, had no statutory tax lien.

Thereafter, MarkAir concluded that it had overpaid certain taxes and requested a refund. The IRS asserted a right to offset the amount of the overpayment against the outstanding tax liabilities of MarkAir and its parent corporation.

MarkAir moved for an order in the bankruptcy court allowing it to use the overpayment to secure its obligations to the Airline Reporting Corporation (ARC), a ticket clearinghouse used by travel agents. ARC had threatened to stop clearing MarkAir's tickets—which essentially would have shut down the airline's business—unless MarkAir posted a letter of credit in the amount of $1.8 million.

To avoid an immediate shutdown of MarkAir's operations, the IRS and MarkAir compromised their positions and entered into an agreement with ARC. The IRS agreed to forego its offset claim and to allow a portion of the overpayment, $1.8 million, to be deposited with the bankruptcy court as the ARC collateral. MarkAir agreed that the balance of the overpayment, approximately $1.3 million, would be paid immediately to the IRS. Further, it agreed that any amount of the collateral remaining upon termination of the agreement with ARC would be paid to the IRS.

Under the agreement, ARC was given a "first judicial lien position" against the collateral, and the IRS was given a "second place judicial lien position." The bankruptcy court approved the compromise be-

tween the IRS and MarkAir and ordered that the "protections" afforded to the IRS under the court's order "shall remain in full force and effect in the event that [MarkAir's] case is converted to another chapter under the . . . Code (or reconverted to Chapter 11) or any subsequent case is filed by or against [MarkAir] under the Code."

MarkAir failed to meet its obligations under the confirmed bankruptcy plan and, in April 1995, filed a second Chapter 11 petition. MarkAir soon ceased operations and, in November 1995, the case was converted to one under Chapter 7. ARC then released its claim against the collateral, and the IRS moved for distribution of the collateral pursuant to the parties' agreement. The Trustee opposed the request. Pursuant to 11 U.S.C. § 724(b), he sought to subordinate the IRS's lien so that he could pay administrative expenses and the claims of other priority creditors.

The bankruptcy court concluded that subordination under § 724(b) was intended to apply to "statutory" tax liens, but not to the "contractual type of lien involved in this case." The court first held that the text of the statute was sufficiently ambiguous to permit the court to explore legislative history for guidance as to Congress' intent. Based on its analysis of the statute's legislative history and text, the court then held that the subordination of tax liens in § 724(b) applies only to statutory liens. Accordingly, the IRS was entitled to recover the full amount of its collateral, namely, the $1.8 million deposit and accrued interest.

The Trustee appealed, arguing that because the IRS's "judicial lien . . . secures an allowed claim for tax, it is a 'lien' within the meaning of § 724(b) and is subject to tax lien subordination." The district court rejected the Trustee's argument and affirmed for the reasons stated in the bank-

ruptcy court's decision. The Trustee filed a timely notice of appeal.

## STANDARDS OF REVIEW

 We review de novo the district court's decision on an appeal from a bankruptcy court. *Neilson v. Chang (In re First T.D. & Inv., Inc.)*, 253 F.3d 520, 526 (9th Cir.2001). We review the bankruptcy court's conclusions of law de novo and its factual findings for clear error. *Id.* We review de novo questions of statutory construction. *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819(9th Cir.2001).

## DISCUSSION

### A. *Text of § 724(b)*

The parties' dispute centers around § 724(b) of the Bankruptcy Code, a provision that partially subordinates tax liens to the claims of a number of other parties, including some priority unsecured claimants. That subsection provides:

Property in which the estate has an interest and that is *subject to a lien* that is not avoidable under this title and *that secures an allowed claim for a tax,* or proceeds of such property, shall be distributed—

(1) first, to any holder of an allowed claim secured by a lien on such property that is not avoidable under this title and that is senior to *such tax lien;*

(2) second, to any holder of a claim of a kind specified in section 507(a)(1), 507(a)(2), 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, to the extent of the amount of such allowed tax claim that is secured by *such tax lien;*

(3) third, to the holder of *such tax lien,* to any extent that such holder's allowed tax claim that is secured by *such tax lien* exceeds any amount distributed under paragraph (2) of this subsection;

(4) fourth, to any holder of an allowed claim secured by a lien on such property that is not avoidable under this title and that is junior to *such tax lien;*

(5) fifth, to the holder of *such tax lien,* to the extent that such holder's allowed claim secured by *such tax lien* is not paid under paragraph (3) of this subsection; and

(6) sixth, to the estate.

11 U.S.C. § 724(b) (emphasis added).

The parties agree that the IRS's lien on the ARC collateral is a "judicial lien," which is defined in the Bankruptcy Code as a "lien obtained by judgment, levy, sequestration, or other legal or equitable process or proceeding." 11 U.S.C. § 101(36). We also agree with this characterization because the IRS's lien arose as a result of a legal proceeding.

However, the Trustee and the IRS advance markedly different views as to the significance of this characterization. The IRS argues that § 724(b) applies only to statutory tax liens and, therefore, that the statute does not require subordination of the IRS's claim. *Id.* § 101(53). By contrast, the Trustee argues that the statute applies to any kind of lien that secures an allowed claim for tax. Accordingly, he claims that the IRS's lien is subordinated to unsecured priority claimants pursuant to § 724(b)(2).

The Trustee and the IRS assert that their respective interpretations of § 724(b) are mandated by the "plain meaning" of the statute's text. *See FDIC v. County of Orange (In re County of Orange),* 262 F.3d 1014, 1018 (9th Cir.2001) ("In construing a statute, we first consider its text." (citation and internal quotation marks omitted)). Neither party is correct. Although the text of the statute provides some support for the Trustee's interpretation, Congress' frequent use of the term "tax lien" in § 724(b) interjects ambiguity.

1. *Widely Acknowledged Meaning of "Tax Lien"*

The term "tax lien" appears seven times in § 724(b). The statute does not define it. When a term is undefined, we usually apply its common meaning. *See Romine v. Diversified Collection Servs., Inc.,* 155 F.3d.1142, 1145 (9th Cir.1998) ("In the absence of statutory definition, a statutory term will be accorded its ordinary meaning."). Further, "[w]ords with a fixed legal or judicially settled meaning, where the context so requires, must be presumed to have been used in that sense." *Huffman v. Commissioner,* 978 F.2d 1139, 1145(9th Cir.1992). The IRS argues that the phrase "tax lien" is a term of art with a widely accepted meaning in tax and bankruptcy law—a statutory tax lien—and that Congress must be deemed to be familiar with the established meaning.

The term "tax lien" does, in general, refer to statutory tax liens. The weight of the relevant case law so holds. *See, e.g., In re Khoe,* 255 B.R. 581, 588 (Bankr. E.D.Cal.2000) ("A federal tax lien is neither a judicial lien nor a non-possessory, nonpurchase money security interest."); *Filipovits v. IRS (In re Filipovits),* No. 94-5-8134-SD, 1995 WL 724520, at *1 (Bankr.D.Md. Sept.20, 1995) ("A tax lien is a statutory lien; and it is not a judicial lien."); *Robinson v. United States (In re Carolina Resort Motels, Inc.),* 51 B.R. 447, 450 (Bankr.D.S.C.1985) ("[T]he legislative history clearly indicates that tax liens are statutory liens.").

Similarly, a number of prominent secondary authorities note that the typical statutory lien is the tax lien. *See, e.g.,* 2 Collier on Bankruptcy ¶ 101.53, at 101–48(Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2002) ("Good examples of statutory liens are tax liens...."); 1

Robert E. Ginsberg & Robert D. Martin, Ginsberg and Martin on Bankruptcy § 6.02[D][2], at 6–30 (4th ed. 2001) ("Typical statutory liens are mechanics' liens and tax liens."). Black's Law Dictionary 1459 (6th ed.1990) defines a "tax lien" generally as:

A statutory lien, existing in favor of the state or municipality, upon the lands of a person charged with taxes, binding the same either for the taxes assessed upon the specific tract of land or (in some jurisdictions) for all the taxes due from the individual, and which may be foreclosed for non-payment, by judgment of a court or sale of the land.

Finally, the Bankruptcy Deskbook notes that "[a] federal tax lien is not a judicial lien." 1 William C. Hillman & Margaret M. Crouch, Practising Law Institute: Bankruptcy Deskbook § 1:4.2, at 1–11 n. 28 (3d ed.2001).

If Congress intended to adopt the common meaning of "tax lien" when it enacted § 724(b), then, "tax lien" would refer only to statutory liens, not judicial liens.

### 2. Context and Structure of the Bankruptcy Code

The Trustee responds by arguing that it is irrelevant that the term "tax lien" commonly refers to a statutory tax lien; the only relevant question is how *Congress* intended the term to be used in § 724(b). The Trustee is correct in stating that, when Congress defines a term, courts are to apply that definition in interpreting the meaning of the statute. *See Stenberg v. Carhart*, 530 U.S. 914, 942, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) ("When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning."); *United States v. Yochum (In re Yochum)*, 89 F.3d 661, 666(9th Cir.1996) ("[I]n statutes that contain statutory definition sections, it is

commonly understood that such definitions establish meaning wherever the terms appear in the same Act.").

As noted, however, Congress failed to define "tax lien" in the statute, even though § 101 of the Bankruptcy Code defines a number of related terms. For example, § 101 defines a "lien" generally as a "charge against or interest in property to secure payment of a debt or performance of an obligation." 11 U.S.C. § 101(37). A "statutory lien" is defined as a

lien arising solely by force of a statute on specified circumstances or conditions, or lien of distress for rent, whether or not statutory, but does not include security interest or judicial lien, whether or not such interest or lien is provided by or is dependent on a statute and whether or not such interest or lien is made fully effective by statute.

*Id.* § 101(53). A "judicial lien" means a "lien obtained by judgment, levy, sequestration, or other legal or equitable process or proceeding." *Id.* § 101(36). Finally, a "security interest" is defined as a "lien created by an agreement." *Id.* § 101(51). These definitions do not tell us directly what Congress meant when it used the term "tax lien."

The Trustee acknowledges that the term "tax lien" appears seven times in § 724(b) but points out that in each instance "tax lien" is preceded by the word "such." He asserts that "such" amounts to a reference throughout § 724(b) to the complete antecedent in subsection (b), namely, "a lien that is not avoidable under this title and that secures an allowed claim for a tax." 11 U.S.C. § 724(b). The foregoing phrase refers only to a "lien," which can include either a statutory lien or a judicial lien. Thus, he argues, Congress intended the phrase "such tax lien" to be defined by reference to subsection (b) and § 101(37)

and thereby intended to supplant the traditional meaning of "tax lien" in § 724(b).

Although the Trustee's parsing of the section is logical, the word "such" will not bear so much weight in this context. In 11 U.S.C. § 724(b)(3), for example, the third payout is to the holder of the tax lien, "to any extent that such holder's *allowed tax claim that is secured by such tax lien* exceeds any amount distributed under paragraph (2) of this subsection." (Emphasis added.) If the Trustee's interpretation were correct, the emphasized phrase "such tax lien" instead would read simply "a lien"; otherwise the repetition of "tax" is redundant. *See United States v. Handy,* 761 F.2d 1279, 1280(9th Cir.1985) ("A statute should be construed so as to avoid making any word superfluous."). In the context of this subsection, at least, Congress appears to have used the term "tax lien" to mean a subset of the larger term "lien."

Additionally, § 724(d) of the Bankruptcy Code states: "A statutory lien the priority of which is determined in the same manner as the priority of a tax lien under section 6323 of the Internal Revenue Code of 1986 shall be treated under subsection (b) of this section the same as if such lien were a tax lien." 11 U.S.C. § 724(d). In other words, statutory liens whose priority is established in the same manner as the priority of a tax lien under § 6323 are treated as if they are tax liens. In subsection (d), the phrase "tax lien" at the end of the sentence refers back to "a tax lien under section 6323 of the Internal Revenue Code of 1986"—a statutory tax lien. Ordinarily, "such" refers to an antecedent phrase. In § 724, however, only subsection (d) explains fully what a "tax lien" might mean. Although it is unusual grammatically, Congress may have used "such tax lien" in § 724(b) to refer to the kind of "tax lien" identified fully in § 724(d).

■ Because neither party's reading of "tax lien" is obviously correct, the statute is ambiguous. When a statute's text is ambiguous, we look to legislative history as an aid to discerning congressional intent. *See Merkel v. Commissioner,* 192 F.3d 844, 848 (9th Cir.1999) ("[I]f the statute is ambiguous, we consult the legislative history, to the extent that it is of value, to aid in our interpretation." (citation and internal quotation marks omitted)); *N.W. Forest Res. Council v. Glickman,* 82 F.3d 825, 834 (9th Cir.1996) ("Where a statute is ambiguous, we may look to legislative history to ascertain its purpose."). We turn next, then, to legislative history.

B. *Legislative History of § 724(b)*

Unfortunately, the legislative history of § 724(b) is not entirely clear. On balance, however, it supports the IRS's interpretation of the statute.

Section § 724(b) was added to the Bankruptcy Code in 1978. The relevant portion of its predecessor provision, § 67c of the Chandler Act, provided:

> *Every tax lien* on personal property not accompanied by possession shall be postponed in payment to the debts specified in clauses (1) and (2) of subdivision (a) of section 104 of this Title. Where *such a tax lien* is prior in right to liens indefeasible in bankruptcy, the court shall order payment from the proceeds derived from the sale of the personal property to which the *tax lien* attaches, less the actual cost of that sale, of an amount not in excess of the *tax lien,* to the debts specified in clauses (1) and (2) of subdivision (a) of section 104 of this Title. If the amount realized from the sale exceeds the total of such debts, after allowing for prior indefeasible liens and the cost of the sale, the excess up to the amount of the difference between the total paid to the debts specified in

clauses (1) and (2) of subdivision (a) of section 104 of this Title. and the amount of the *tax lien,* is to be paid to the holder of the *tax lien.*

11 U.S.C. § 107(c)(3) (codifying § 67c) (superseded by § 724(b) in 1978) (emphasis added).

The legislative history of § 67c of the Chandler Act demonstrates that, when Congress used the term "tax lien" in the statute, it intended the term to mean only statutory liens. The report of the Senate Committee on the Judiciary stated that "the effect of section 67c is limited to statutory liens and does not include consensual liens." S.Rep. No. 89–1159 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2456, 2460. Further, Congress noted that "new section 67c establishes more effective standards for the treatment of statutory liens." *Id.* at 2462. As the leading bankruptcy treatise explained the legislative history of the Act, "[n]onstatutory tax liens[were] not affected by § 67c." 4 Collier on Bankruptcy¶ 67.27, at 377 (Lawrence P. King ed., 14th ed.1978). Thus, the provision of the statute that § 724(b) replaced had *no* subordinating effect on judicial liens or on contractual liens ("security agreements" under the current code), even when those types of liens secured an allowed claim for tax.

The committee reports produced in the drafting and enactment of § 724(b) suggest that this result is unchanged under the new code. As the report of the House Committee on the Judiciary explains, § 724(b) "governs tax liens. It is derived from section 67c(3) of the Bankruptcy Act, *without substantial modification in result.*" H.R.Rep. No. 95–595 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6338 (emphasis added). Similarly, the report states: "Tax liens are also included in the definition of *statutory lien.*" *Id.* at 6271 (emphasis added). The report also explains that "[t]he House amendment modifies present law by requiring the subordination of tax liens." *Id.* at 6501. These passages in the legislative history show that Congress intended the term "tax lien" in § 724(b), like in § 67c(3) of the Chandler Act, to refer only to statutory liens.

While the Trustee correctly counters that the legislative history of § 724(b) demonstrates that the reach of that section is broader than that of its predecessor, § 67c, nothing in that history suggests that the particular ways in which § 724(b) is broader than § 67c have anything to do with the distinction between statutory and other types of tax liens. Rather, § 724(b) appears simply to expand the *types of property* to which a subordinated tax lien may be attached:

The House amendment modifies present law by requiring the subordination of tax liens on both real and personal property to the payment of claims having a priority. This means that assets are to be distributed from the debtor's estate to pay higher priority claims before the tax claims are paid, even though the tax claims are properly secured. Under present law and the Senate amendment only tax liens on personal property, but not on real property, are subordinated to the payment of claims having a priority above the priority for tax claims.

H.R.Rep. No. 95–595 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6570. As Collier notes:

Section 724(b) is considerably broader, however, than was section 67c(3). Section 67c(3) applied only to tax liens on personal property unaccompanied by a change of possession. It did not apply to tax liens on real property nor did it apply to tax liens on personal property where the lienholder obtained possession of the property prior to bankruptcy. In

contrast, section 724(b) applies to all types of property and is not dependent on possession.

6 Collier on Bankruptcy ¶ 724LH[2], at 724–19 to –20.

In summary, the better reading of the legislative history is that Congress intended to confine the application of § 724(b) to statutory liens. Nonetheless, because the text, context, and legislative history do not provide a definitive answer, we next consider cases interpreting § 724(b) and the public policy considerations underlying Congress' enactment of the statute.

### C. Cases

The Trustee and the IRS cite a number of cases in support of their respective interpretations. However, the parties' citations and our own research have not uncovered any decision addressing the same issue that we face.

The Trustee argues that two cases discussing the validity of cash collateral orders support his position. *In re Bino's Inc.*, 182 B.R. 784 (Bankr.N.D.Ill.1995); *In re Life Imaging Corp.*, 131 B.R. 174 (Bankr.D.Colo.1991). Although those cases contain isolated passages favoring the Trustee, neither is entirely on point because the IRS in both cases already had a *statutory* lien on the property in question, which was converted to a judicial lien by agreement of the parties. The courts in those cases thus focused on the fact that, by compromising the tax claim, the trustee was "bargain[ing] away the tax lien subordination provisions of § 724(b)" and attempting to "override the subordination provisions of § 724(b)." *Bino's*, 182 B.R. at 787–88.

In the present case, however, the IRS did not have a statutory lien on the ARC collateral but, instead, had actual possession of the funds. Therefore, in the absence of the parties' agreement, there would have been *no* lien to subordinate pursuant to § 724(b). Accordingly, the parties cannot be said to have been "bargaining away" or "overriding" § 724(b), and *Life Imaging* and *Bino's* are inapposite.

Moreover, those two decisions do not represent the only approach adopted by courts in cash collateral order cases. For example, in *In re Buzzworm, Inc.*, 178 B.R. 503, 505 (Bankr.D.Colo.1994), the court concluded that enforcement of a cash collateral agreement need not violate the statute: "[A] tax lien creditor, under the right circumstances, may avoid, by agreement, the distribution scheme under Section 724(b) ...." The court's rejection of the approach adopted in *Bino's* and *Life Imaging* is well reasoned and relies on the text of the statute, its legislative history, and public policy considerations. *Id.* at 509–12. Thus, contrary to the Trustee's claims, the cash collateral cases do not necessarily support his interpretation of § 724(b).

Other cases discussing § 724(b) are of little help in determining whether the statute applies to judicial liens. Accordingly, we move to our final consideration: the policies underlying Congress' enactment of the statute and the policy consequences of adopting each party's construction of § 724(b).

### D. Policy

■ When one considers Congress' primary purpose in enacting § 724(b), the IRS's construction might, at first glance, seem illogical. As both parties properly concede, an important purpose of § 724(b) is to offer some protection to certain priority claimants—such as spouses, dependent children, farmers, fishers, consumers, and employees—from tax claims that otherwise would consume most or all of the bank-

ruptcy estate. *See Gouveia v. IRS (In re Quality Health Care)*, 215 B.R. 543, 557 (Bankr.N.D.Ind.1997); *see also N. Slope Borough v. Barstow*, No. 01–35892, 2002 WL 31356303, at *3, —— F.3d ——, —— (9th Cir.2002) (decided this date) (holding that the language of § 724(b) unambiguously establishes partial subordination of tax liens to the interests of priority unsecured creditors). If the purpose of the statute is truly to protect priority claimants and to ensure that they are paid before the taxing authorities are, it seems implausible that Congress intended to distinguish among different types of liens.

On the other hand, when viewed from another perspective, the IRS's construction of the statute is entirely reasonable. Congress enacted § 67c of the Chandler Act in response to similar concerns about protection of administrative and wage claimants yet, as discussed above, Congress clearly chose to limit the application of subordination to only statutory claims. In balancing the competing interests of tax lienholders and priority unsecured claimants, Congress easily could have concluded that the fairest course of action was to subordinate some, but not all, liens securing claims for tax.

Further, the policy consequences of adopting the IRS's view are more consonant with the overall bankruptcy scheme. The IRS had MarkAir's tax refund in its possession, and the IRS's potential right to retain the refund did not arise pursuant to any type of lien. That is, under either party's view of the statute, the IRS's claim to the refund was not originally subject to subordination under § 724(b). Only when the refund was offered to MarkAir for use in the company's reorganization did the IRS's claim become secured with a judicial lien. In that circumstance, the IRS was acting in its capacity as an "ordinary" creditor, not in its capacity as a tax collector.

Under the Trustee's interpretation, the IRS's claim to the refund was transformed into a subordinated claim simply because the IRS entered into an agreement with the company for release of the refund for use in reorganization. That reading of the law would discourage taxing authorities from releasing any funds that otherwise could be used to resurrect a failing company. This concern was a significant factor motivating the *Buzzworm* court to hold that cash collateral orders may modify the operation of § 724(b):

> [T]here are strong practical and policy reasons for enforcing such Chapter 11 agreements [protecting tax claimants from the operation of § 724(b)] against a Chapter 7 trustee. Enforcing such agreements will encourage lien creditors to better cooperate with a reorganizing debtor and reduce pressure, early in the case, to litigate and, perhaps, prematurely "pull the plug" on a debtor.

*Buzzworm*, 178 B.R. at 509.

We think that Congress intended to encourage the kind of behavior that the IRS exhibited in this case; it left money in the estate when it was not required to do so, in the hope of assisting MarkAir to survive. That behavior furthers the overall purpose of the Bankruptcy Code.

### E. *Conclusion*

The text of § 724(b) is ambiguous. Its context, structure, legislative history, and purpose convince us that Congress intended the phrase "tax lien" to refer to statutory tax liens and not to judicial liens securing the payment of taxes. Accordingly, we affirm the decision of the bankruptcy court and the district court.

AFFIRMED.